******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

CHRISTOPHER WILLIAMS, ADMINISTRATOR
(ESTATE OF JOHN WILLIAMS) *v.*
LAWRENCE + MEMORIAL
HOSPITAL, INC., ET AL.
(AC 44065)

Cradle, Clark and Flynn, Js.

*Syllabus*

The plaintiff, as administrator of the estate of the decedent, sought to recover
damages for medical malpractice from the defendant B, an emergency
medicine physician who treated the decedent for injuries sustained in
a motorcycle accident that ultimately led to his death. At the conclusion
of the plaintiff's case-in-chief, the plaintiff moved to admit into evidence
certain excerpts from a medical text known as the Advanced Trauma
Life Support guidelines, which the plaintiff contended constituted excep-
tions to the rule against hearsay as statements in learned treatises,
pursuant to the applicable provision (§ 8-3 (8)) of the Connecticut Code
of Evidence. The basis for the plaintiff's motion was that two of his
medical experts had recognized those guidelines as an authoritative
treatise in the field of trauma medicine and had relied on specific por-
tions of the guidelines in providing their expert testimony. The court
denied the plaintiff's motion on the ground that the relevant excerpts
could confuse the jurors as to the relevant standard of care. Following
the jury's verdict for B, the plaintiff appealed to this court, claiming
that § 8-3 (8) creates a presumption of admissibility, that the guidelines
met the requirements for admission, and, accordingly, that the trial court
lacked a legal basis upon which to exclude them. *Held* that the trial court
did not abuse its discretion in precluding admission of the guidelines
excerpts; although Connecticut permits the admission of learned trea-
tises into evidence, the court had the discretion to exclude evidence
that carried the danger of misunderstanding or misapplication by the
jury, and the court correctly determined that, had the excerpts been
admitted, the jury could mistakenly have assessed B's conduct only in
light of the guidelines rather than determining whether B deviated from
the standard of care in treating the decedent, as, throughout the trial,
the plaintiff repeatedly and erroneously contended that the guidelines
set forth the relevant standard of care.

Argued November 16, 2021—officially released April 5, 2022

*Procedural History*

Action to recover damages for medical malpractice,
and for other relief, brought to the Superior Court in
the judicial district of New London, where the action
was withdrawn as against the named defendant et al.;
thereafter, the matter was tried to the jury before
*Swienton, J.*; subsequently, the court denied the plain-
tiff's motion to admit certain evidence; verdict and judg-
ment for the defendant Peter Bertolozzi, from which
the plaintiff appealed to this court. *Affirmed.*

*Dana M. Hrelic*, with whom were *Stacie L.
Provencher*, and, on the brief, *Karen L. Dowd*, for the
appellant (plaintiff).

*Logan A. Carducci*, with whom was *Frederick J.
Trotta, Sr.*, for the appellee (defendant Peter Berto-
lozzi).

*Opinion*

CRADLE, J. In this medical malpractice action, the plaintiff, Christopher Williams, administrator of the estate of John Williams (decedent), appeals from the judgment of the trial court, rendered after a jury trial, in favor of the defendant, Peter Bertolozzi, an emergency medicine physician.[1] On appeal, the plaintiff claims that the trial court abused its discretion by declining to admit into evidence certain excerpts from the Advanced Trauma Life Support (ATLS) guidelines, which the plaintiff argues were admissible under § 8-3 (8) of the Connecticut Code of Evidence. We disagree and, accordingly, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In the early afternoon hours of August 9, 2015, the decedent was operating his motorcycle when he collided with an oncoming vehicle. He sustained critical injuries to his lower body[2] and was transported by ambulance to Lawrence + Memorial Hospital (hospital) in New London, where he was placed under the care of, and treated by, the defendant.

Shortly after arriving at the hospital, the decedent lost consciousness. The defendant intubated the decedent and ordered a blood transfusion.[3] Concerned that the decedent was bleeding internally and had suffered head trauma, the defendant sent the decedent for a CT scan in order to locate the source of the hemorrhaging and to diagnose other potential injuries. The defendant also consulted with David Reisfeld, the onsite surgeon, to determine whether the decedent could be effectively stabilized at the hospital or whether he required transfer to a designated trauma facility. Specifically, Reisfeld and the defendant determined that, if the decedent was bleeding abdominally, Reisfeld could operate onsite at the hospital. If, however, the decedent presented with intracranial bleeding or a lower extremity or vascular issue, Reisfeld and the defendant concluded that the decedent would need to be transferred to a designated trauma facility.

After the decedent underwent the CT scan, the defendant spoke with the hospital's orthopedic surgeon, who concluded that the decedent likely was suffering from a vascular issue. The defendant also discussed the results of the CT scan with the hospital's radiologist. After conferring with both the orthopedic surgeon and the radiologist, the defendant concluded that the decedent had suffered injuries beyond the hospital's capacity for treatment and required transfer to a designated trauma facility for further diagnoses and treatment. The defendant then arranged for the decedent to be transported via helicopter to Yale New Haven Hospital. Shortly after air medics arrived at the hospital to transport the decedent, he suffered cardiac arrest and was pronounced dead later that day.

The plaintiff commenced the present action on July 22, 2016, by way of a three count complaint against the defendant, Reisfeld, and the hospital. On November 25, 2019, the plaintiff filed a third revised complaint[4] against the defendant alleging, inter alia, that the defendant deviated from the applicable standard of care[5] in two ways. First, the plaintiff alleged that the defendant failed to recognize that the decedent's condition required an immediate transfer to a designated trauma facility. Second, the plaintiff alleged that the defendant failed to follow appropriate protocols for the care and treatment of a trauma patient.[6] The defendant denied both allegations.

A ten day jury trial commenced on November 12, 2019. At trial, the plaintiff argued that the defendant deviated from the standard of care by failing to follow the ATLS guidelines, a medical text promulgated by the American College of Surgeons that sets forth procedures, protocols, and practices for emergency medical professionals to follow when treating trauma patients.

In support of his claim that the defendant deviated from the standard of care by failing to follow the ATLS guidelines, the plaintiff presented the testimony of two expert witnesses, Kevin Brown, a board-certified emergency medicine physician, and Ronald Simon, a board-certified trauma surgeon.[7] Brown testified that the ATLS guidelines are an authoritative resource that sets forth the best practices for the initial stabilization of trauma patients. As an ATLS instructor, Brown explained that the ATLS guidelines are taught to emergency medical professionals in a biannual, two day course, which includes both practical instruction and clinical scenarios, and that the successful completion results in a three year ATLS certification. Brown also testified that the ATLS guidelines are an evolving text that changes every three years in line with contemporary medical research.

In the context of the present case, Brown testified that the ATLS guidelines establish standardized procedures for the initial care of trauma patients, patients diagnosed with severe pelvic injuries, and patients who require transfer to a separate trauma facility. Relying on the guidelines, Brown opined that the defendant deviated from the standard of care by (1) failing to administer appropriate resuscitative blood to the decedent, (2) failing to immediately transfer the decedent to a designated trauma facility, (3) ordering a CT scan instead of less time intensive procedures, and (4) failing to use a "pelvic binder" device to stabilize the decedent's pelvic fracture and reduce bleeding. On redirect examination, Brown clarified that, although the ATLS guidelines set forth specific procedural steps, physicians retain discretion in treating trauma patients. Specifically, he testified that the ATLS guidelines "don't cover every single . . . possibility that there is . . . when there are straightforward kind of protocols to

implement or approaches to implement you follow along the protocol and you can still use judgment . . . . So it's not one or the other. There are guidelines throughout medicine and [applying those guidelines] has to be reasonable to that case . . . [s]o we have so many guidelines for so many different conditions."

Simon testified that the ATLS guidelines were intended to provide emergency medical professionals with a uniform, international standard to follow during the initial care of trauma patients. He testified further that the guidelines set forth a "well-defined algorithm" that assists emergency medicine professionals to identify and treat injuries that present the most immediate threat to a patient's life. Simon opined that, had the ATLS procedural steps been followed in the present case, the decision to transfer the decedent to a designated trauma facility would have been expedited. Specifically, Simon testified that the defendant should have performed a Focused Assessment with Sonography for Trauma (FAST) examination to determine whether the decedent was bleeding internally.[8] By contrast, Simon testified that the CT scan was time intensive and unsafe because the procedure required that the patient be alone in a room until the scan was completed.

On cross-examination, Simon conceded that FAST examinations generally are less accurate than CT scans, especially when performed on larger patients and patients diagnosed with pelvic fractures, such as the decedent. He also testified that only trauma surgeons are required to "remain current in ATLS" while emergency medicine physicians, such as the defendant, are not required to recertify. Nevertheless, Simon testified that the ATLS guidelines informed the standard of care with regard to the defendant's treatment of the decedent.

The plaintiff also called the defendant to testify as to the ATLS guidelines. The defendant testified that he had become ATLS certified in 2010 and, despite electing not to recertify, had kept abreast of the evolving guidelines. The defendant testified that the ATLS guidelines are "a good primer and . . . very good for people who don't work in emergency department[s], or are not surgeons . . . ." The defendant clarified that he "consider[s] many things authoritative . . . [but] would not say ATLS is the most authoritative trauma . . . resource . . . ."

At the conclusion of the plaintiff's case-in-chief, the plaintiff's counsel moved, pursuant to § 8-3 (8) of the Connecticut Code of Evidence, to admit into evidence certain excerpts from the ATLS guidelines.[9] The basis for the plaintiff's motion was that Brown and Simon recognized the ATLS guidelines as an authoritative treatise in the field of trauma medicine and relied on specified portions of the guidelines in providing their expert testimony. The defendant objected, arguing that admit-

ting "medical article[s] into evidence . . . [would be] inappropriate." The court, *Swienton, J.*, denied the plaintiff's motion on the ground that the admission of the relevant excerpts could confuse the jurors as to the relevant standard of care. Specifically, the court stated, "I think it's the court's discretion and I think that . . . [Brown and Simon have] testified from these portions [of the ATLS guidelines] already, and I think having the texts themselves in the jury . . . deliberation room . . . could just lead to some confusion by the jurors, and I'm not going to admit them as full into evidence as full exhibits."

The defendant also presented testimony from two standard of care experts, William Dalsey, a board-certified emergency medicine physician, and George Velmahos, a board-certified surgeon. Both Dalsey and Velmahos addressed the ATLS guidelines during their testimony.

Dalsey testified that he was an ATLS instructor from 1981 through the early 2000s. He also testified that the purpose of the ATLS course and guidelines is "to begin the initial education and training of health-care providers in the treatment of trauma" and that ATLS is "primarily focused on people that don't take care of patients that are trauma victims on a regular basis." Specifically, Dalsey clarified that "[ATLS] is useful for physicians who don't work in emergency departments, who don't take care of trauma patients . . . ."

Dalsey further testified that emergency physicians are not required to maintain ATLS certification because "the training [that] an emergency physician goes through is beyond what the ATLS [guidelines teach] and is beyond the scope of the beginning education that ATLS tries to provide." Accordingly, Dalsey opined that "ATLS [does not set] a standard of care [and] was never intended to set a standard of care [because] . . . emergency physicians are trained past the point of the basic algorithms of ATLS . . . ."

On cross-examination, the plaintiff's counsel asked Dalsey whether the ATLS guidelines were "a reasonable standard of care for this jury to adopt." The defendant objected to the question, at which point the court dismissed the jury from the courtroom. Outside the presence of the jury, the defendant's counsel explained his objection, stating, "The court's mindful of my objection that the jury doesn't adopt the standard of care. . . . These physicians all qualified will come in and testify as to their impression of [the] standard of care. The jury isn't the people adopting the standard of care . . . . They're going to define the case based upon the evidence in front of them." In response, the plaintiff's counsel contended that the ATLS guidelines not only inform the standard of care but that they are "de facto . . . the standard of care. In other words . . . when you have a [trauma] patient, you follow [the ATLS]

algorithm." The court agreed with the defendant's counsel, stating, "I'm concerned that the jurors are going to want to look at ATLS to read and say . . . this is what the standard of care is. Now, obviously, this is a manual and we've heard from different people exactly what it is, and then each doctor has had their own interpretations and then . . . indicates what the standard of care is based on their training and experience not on that manual. . . . I don't believe in any case that there's a book out there that sets [the] standard of care." The court also expressed concern that the question asked by the plaintiff's counsel may have caused the jurors to incorrectly believe that they were responsible for determining the standard of care rather than relying on expert testimony.

The defendant's counsel then requested a curative instruction indicating that "ATLS is not the standard of care" and that the ATLS guidelines "[don't] even apply to [the defendant] . . . ." The court declined to so instruct the jury, but rather invited both parties to submit alternative proposed curative instructions on the issue.[10]

After the jury reentered the courtroom, the court reiterated, pursuant to General Statutes § 52-184c (a), that "the prevailing professional standard of care for a given health care provider shall be that level of care, skill and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers." The court also clarified that the jury was not responsible for "setting" the standard of care and explained to the jurors that "it's going to be your job at the end of this case to determine or to decide which one of these competing expert opinions you choose to believe."

After Dalsey testified, the defendant called Velmahos to testify as to the relevant standard of care. Velmahos testified that he currently teaches the ATLS course and described the ATLS guidelines as "one of the most wonderful things . . . in the world." Specifically, Velmahos testified that the ATLS guidelines "produced a standardized language that can be universally applied around the world to care for the majority of trauma patients." Velmahos clarified, however, that the ATLS guidelines were only intended as a "starting place" for the care of trauma patients and that the guidelines "cannot arrive at the sophistication that sometimes is required because [they have] to apply everywhere in the world." Velmahos opined that the defendant did not deviate from the standard of care by ordering a CT scan and met the standard of care regarding his duty owed to the decedent.

Before the close of evidence, the court held a charging conference off the record. During that conference, the plaintiff asked the court to reconsider its ruling

regarding the admissibility of the ATLS guideline excerpts. Later, on the record, the court explained that, during the charging conference, it had reexamined its earlier decision to exclude the ATLS excerpts but was going to reserve its final ruling until it heard argument from both parties. Thereafter, the defendant's counsel renewed his objection to the admission of the ATLS excerpts, arguing that their admission would confuse the jury due to their "unfair characterization of the state of emergency medicine . . . ." The defendant's counsel also contended that admitting the ATLS excerpts would prejudice his defense because he "crafted [his] examination of . . . witness[es] . . . based upon the status of the evidence and the relatively clear decision by the court that those various little snippets of the several hundred page [ATLS guidelines] weren't going to come in." In response, the plaintiff's counsel, citing *Filippelli* v. *Saint Mary's Hospital*, 319 Conn. 113, 124 A.3d 501 (2015), argued that Connecticut law favors the admission of learned treatises.[11]

Ultimately, the court concluded that it would not admit the ATLS excerpts. The court determined that the excerpts were "thoroughly discussed and examined by all the experts and . . . to have them admitted at this point . . . would cause confusion to the jury."

After both parties rested, the court charged the jury on the appropriate standard of care in medical malpractice actions and issued a curative instruction regarding the ATLS guidelines. The court instructed, inter alia, that "[§ 52-184c (a)] . . . provides that . . . [i]n any civil action to recover damages resulting from personal injury in which it is alleged that such injury resulted from the negligence of a health care provider . . . the claimant shall have the burden of proving by a preponderance of the evidence that the alleged actions of the health care provider represented a [deviation from] the prevailing professional standard of care for that health care provider.

"The prevailing professional standard of care for a given health care provider shall be that level of care, skill and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers . . . .

"Now, you have heard testimony from the medical experts regarding the standard of care. . . . You have also heard from counsel and testimony from experts about ATLS . . . and the standards and guidelines set forth therein. ATLS does not establish the standard of care. Rather, the standard of care is that level of care, skill and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers.

"However, if you find based on the facts of this case that the ATLS standards and guidelines comport to the medical standard of care applicable in this case as determined by the medical testimony of the experts, then the ATLS guidelines may be properly considered by you as evidence when determining whether [the defendant] deviated from the standard of care."

After deliberation, the jury found that the plaintiff failed to prove, by a preponderance of the evidence, the prevailing professional standard of care applicable to the defendant with regard to his treatment of the decedent.[12] Accordingly, the jury returned a verdict in favor of the defendant.

On December 23, 2019, the plaintiff filed a motion to set aside the verdict and for a new trial. The plaintiff argued, inter alia, that the court had abused its discretion by refusing to admit the ATLS excerpts into evidence. Relying on § 8-3 (8) of the Connecticut Code of Evidence and *Filippelli* v. *Saint Mary's Hospital*, supra, 319 Conn. 135, the plaintiff contended that Connecticut law favors the admission of learned treatises and, accordingly, that the court lacked a sufficient legal basis to exclude the excerpts. The defendant subsequently filed an objection to the plaintiff's motion to set aside the verdict and for a new trial.

On February 4, 2020, the trial court heard argument on the plaintiff's motion to set aside the verdict and for a new trial. Again, the plaintiff argued that the court had erred in excluding the ATLS excerpts because, in his view, the ATLS guidelines actually set forth the relevant standard of care applicable to the facts in the present action. The plaintiff also contended that the court's curative instruction clarifying that the ATLS guidelines were not the standard of care, but rather could be seen as informing the statutorily mandated standard of care, actually created additional confusion amongst the jurors. In response, the defendant argued that the jury heard ample testimony regarding the ATLS guidelines from expert witnesses on both sides and, therefore, did not need the actual excerpts admitted into evidence. The defendant also cautioned that the jurors could have placed too much emphasis on the ATLS guidelines during deliberations, had the guidelines been admitted.

On March 6, 2020, the court denied the plaintiff's motion to set aside the verdict and for a new trial. In its memorandum of decision, the court clarified that it excluded the ATLS excerpts in order to prevent misunderstanding or misapplication of the relevant standard of care by the jury. The court further reasoned that, "[b]ecause the ATLS guidelines do not establish the requisite professional standard of care, and because the plaintiff was afforded the opportunity to question his experts as to the ATLS guidelines and make reference

to the appropriate excerpts, the plaintiff was not deprived of the ability to fully litigate the issue of the standard of care in this matter. The excerpts the plaintiff sought to introduce were read to the jury on multiple occasions during trial, and reference was made to them during the questioning of his experts, as well as the defendant's experts." This appeal followed.

On appeal, the plaintiff claims that the court abused its discretion by refusing to admit the ATLS guidelines excerpts into evidence at trial. Relying on *Filippelli* v. *Saint Mary's Hospital*, supra, 319 Conn. 135, the plaintiff contends that the ATLS guidelines satisfied the two foundational requirements for admission under § 8-3 (8) of the Connecticut Code of Evidence. Specifically, the plaintiff argues that, because the ATLS guidelines were " '[1] recognized as a standard authority in the field by . . . [an] expert witness . . . and . . . [2] relied on by that expert during direct examination,' " the excerpts should have been admitted into evidence. We are not persuaded.

We begin our analysis by setting forth the appropriate standard of review and the relevant principles of law that govern the plaintiff's claim on appeal. "It is well settled that [w]e review the trial court's decision to admit [or exclude] evidence, if premised on a correct view of the law . . . for an abuse of discretion. . . . Under the abuse of discretion standard, [w]e [must] make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . [Thus, our] review of such rulings is limited to the questions of whether the trial court correctly applied the law and reasonably could have reached the conclusion that it did. . . . Moreover, [b]efore a party is entitled to a new trial because of an erroneous evidentiary ruling, he or she has the burden of demonstrating that the error was harmful. . . . [A]n evidentiary impropriety in a civil case is harmless only if we have a fair assurance that it did not affect the jury's verdict. . . . A determination of harm requires us to evaluate the effect of the evidentiary impropriety in the context of the totality of the evidence adduced at trial." (Citations omitted; internal quotation marks omitted.) *Filippelli* v. *Saint Mary's Hospital*, supra, 319 Conn. 119.

"Under § 8-3 (8) of the Connecticut Code of Evidence, a statement contained in a published treatise, periodical or pamphlet on a subject of history, medicine, or other science or art may be admitted into evidence as an exception to the hearsay rule if two foundational requirements are satisfied. First, the work must be recognized as a standard authority in the field by the witness, other expert witness or judicial notice, and, second, the work must either be brought to the attention of the witness on cross-examination or have been relied on by that expert during direct examination. . . .

"Connecticut's learned treatise rule differs from that of most other jurisdictions, including the federal rule, in that we allow the material to be taken into the jury room as a full exhibit. . . . Most other jurisdictions bar such material from the jury room, limiting their use to an oral reading in connection with an expert witness' testimony. . . . This limitation seeks to avoid the danger of misunderstanding or misapplication by the jury and ensures that the jurors will not be unduly impressed by the text or use it as a starting point for reaching conclusions untested by expert testimony. . . . The Connecticut rule, on the other hand, has the advantage of allowing the jurors to examine more fully the text of what frequently is a technical and complicated discussion that may be unfathomable to a nonexpert juror who merely heard a single oral recitation. Although the concerns which underlie the federal rule cannot be completely obviated when the materials are allowed in the jury room, the dangers can be minimized by the judicious exercise of discretion by the trial court in deciding which items ought to be admitted as full exhibits." (Citation omitted; internal quotation marks omitted.) Id., 135–36.

Relying on this language, the plaintiff argues that § 8-3 (8) of the Connecticut Code of Evidence creates a presumption of admissibility in favor of learned treatises, provided that the treatise is (1) recognized as a standard authority in the field by expert testimony or judicial notice, and (2) relied on by an expert during direct examination or brought to the attention of the expert on cross-examination. Accordingly, the plaintiff argues that the court lacked a legal basis on which to exclude the ATLS excerpts. We find this reading to be misguided.

Although, Connecticut *permits* the admission of learned treatises, our Supreme Court in *Filippelli* explicitly held that § 8-3 (8) of the Connecticut Code of Evidence neither mandates admission nor limits the trial court's discretion to exclude evidence that "carries the danger of misunderstanding or misapplication by the jury . . . ." (Internal quotation marks omitted.) *Filippelli* v. *Saint Mary's Hospital*, supra, 319 Conn. 140. Rather, in upholding the trial court's decision to restrict the plaintiff's use of a learned treatise on cross-examination, the court in *Filippelli* clarified that "the mere fact that [a] trial court found that the article met the requirements for admissibility under the learned treatise exception does not mean that the court was *required* to allow the plaintiff unfettered use of the article. *Section 8-3 (8) merely provides that materials which meet the foundational requirements of the learned treatise exception are not excluded by the hearsay rule, and does not mandate the admission of such materials or otherwise purport to circumscribe the discretion generally afforded to a trial court to deter-*

*mine the admissibility of evidence in light of the facts of record. . . .* [W]e have long recognized that this state's approach to the learned treatise exception, which allows materials admitted under the rule to be treated as full exhibits and taken into the jury room during deliberations, carries the danger of misunderstanding or misapplication by the jury that other jurisdictions seek to avoid by precluding the admission of such materials as full exhibits. . . . We therefore have explained that trial courts may minimize the risks posed by the rule by use of the judicious exercise of discretion . . . in deciding which items ought to be admitted as full exhibits." (Citations omitted; emphasis added; internal quotation marks omitted.) Id., 139–40.

Applying the foregoing legal principles to the present case, we conclude that it was well within the court's discretion to preclude admission of the ATLS excerpts. Even assuming that the excerpts met the requirements for admissibility under the learned treatise exception, we cannot conclude that the court abused its discretion in excluding them on the ground that they may have confused the jury. Throughout trial and in his posttrial motion, the plaintiff repeatedly and erroneously contended that the ATLS guidelines actually set forth the relevant standard of care in the present action. These assertions required the court to continuously clarify that the proper standard of care is "that level of care, skill and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers." General Statutes § 52-184c (a). Accordingly, the court correctly determined that, had the excerpts been admitted, the jury may mistakenly have assessed the defendant's conduct only in light of the ATLS guidelines, rather than determining whether the defendant deviated from the standard of care.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Although the plaintiff's complaint initially named David Reisfeld, a general surgeon, and Lawrence + Memorial Hospital, Inc. (hospital) as defendants, the plaintiff subsequently withdrew his claims against Reisfeld and the hospital. Neither Reisfeld nor the hospital are parties to this appeal. Accordingly, all references to the defendant are to Bertolozzi only.

[2] Specifically, the decedent suffered a femoral fracture and an "open book" pelvic fracture, along with other injuries to his head and chest.

[3] Although the defendant ordered that the decedent receive four units of blood, it was later established, during cross-examination, that the decedent was administered only two units of blood.

[4] The third revised complaint is the operative complaint in this matter.

[5] The standard of care for medical malpractice actions is set forth in General Statutes § 52-184c (a), which provides in relevant part: "The prevailing professional standard of care for a given health care provider shall be that level of care, skill and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers."

[6] Prior to trial, the defendant filed a motion in limine seeking to preclude evidence or argument which improperly (1) substituted " 'safety rules' " for the statutorily defined standard of care set forth in General States § 52-184c, (2) invited jurors to use their own common sense in determining the standard of care rather than relying on expert testimony, or (3) invited the jury to

consider itself the " 'conscience of the community' " in deciding whether the defendant deviated from the prevailing standard of care. Specifically, the defendant argued that admitting " 'safety rules' " would confuse the jury because such rules imply that physicians are held to a higher standard than the statutorily defined duty of care owed by a physician to his or her patient. After hearing argument from both parties on the defendant's motion in limine, the court ruled that it "would not allow any argument to the jur[ors] which would imply that they were setting the standard of care as it relates to the medical treatment of [the decedent], or that their decision carries weight outside of the courtroom, or any other argument which is in conflict with the statutory requirement and definition of the standard of care."

[7] The plaintiff also repeatedly referenced the ATLS guidelines during opening and closing argument, contending that the guidelines were an "algorithmic" procedure and a "proven cookbook" that emergency medical professionals are required to follow when treating trauma patients.

[8] FAST is a limited bedside ultrasound performed by emergency physicians to quickly detect abdominal fluid or cardiac complications.

[9] Section 8-3 (8) of the Connecticut Code of Evidence is known as the statement in learned treatises exception to the rule against hearsay. It provides: "The following are not excluded by the hearsay rule, even though the declarant is available as a witness . . . (8) Statement in learned treatises. To the extent called to the attention of an expert witness on cross-examination or relied on by the expert witness in direct examination, a statement contained in a published treatise, periodical or pamphlet on a subject of history, medicine, or other science or art, recognized as a standard authority in the field by the witness, other expert witness or judicial notice." Conn. Code Evid. § 8-3 (8).

The commentary to § 8-3 (8) of the Connecticut Code of Evidence further clarifies that "[§ 8-3 (8)] explicitly permits the substantive use of statements contained in published treatises, periodicals or pamphlets on direct examination or cross-examination under the circumstances prescribed in the rule. In the case of a journal article, the requirement that the treatise is recognized as a 'standard authority in the field' . . . generally requires proof that the specific article at issue is so recognized. . . . There may be situations, however, in which a journal is so highly regarded that a presumption of authoritativeness will arise with respect to an article selected for publication in that journal without any additional showing. . . . Although most of the earlier decisions concerned the use of medical treatises . . . Section 8-3 (8), by its terms, is not limited to that one subject matter or format. . . . Connecticut allows the jury to receive the treatise, or portion thereof, as a full exhibit. . . . If admitted, the excerpts from the published work may be read into evidence or received as an exhibit, as the court permits." (Citations omitted.)

[10] The parties filed supplemental requests to charge regarding the ATLS excerpts on November 22, 2019.

[11] In *Filippelli*, our Supreme Court clarified that, unlike most other jurisdictions, which limit the use of learned treatises to an "oral reading in connection with an expert witness' testimony," Connecticut's learned treatise rule permits such treatises "to be taken into the jury room as . . . full exhibit[s]." (Internal quotation marks omitted.) *Filippelli* v. *Saint Mary's Hospital*, supra, 319 Conn. 135. The court explained that the "Connecticut rule . . . has the advantage of allowing the jurors to examine more fully the text of what frequently is a technical and complicated discussion that may be unfathomable to a nonexpert juror who merely heard a single oral recitation." (Internal quotation marks omitted.) Id., 135–36. However, as we discuss later in this opinion, the Connecticut rule does not circumscribe a trial judge's discretion to limit or exclude learned treatise evidence that has the tendency to mislead the jury or cause confusion. Id., 139–40. Indeed, our Supreme Court in *Filippelli* upheld the trial court's ruling restricting the plaintiff's use of a learned treatise on cross-examination. Id., 140–41.

[12] Having found this, the jury did not reach the additional questions of whether the defendant deviated from the standard of care and whether that was the proximate cause of the decedent's death.

---